**HENRY G. MEIGS, INC., a corporation, Plaintiff,**

v.

**EMPIRE PETROLEUM COMPANY, a corporation, Defendant.**

**Civ. A. No. 57–C–94.**

United States District Court
E. D. Wisconsin.
April 8, 1959.

Martin J. Torphy, Ray T. McCann, Milwaukee, Wis., for plaintiff.

John S. Walter, Sheboygan, Wis., William R. Loeffler, Denver, Colo., for defendant.

GRUBB, District Judge.

Action at law on a contract.

In 1955 Wisconsin Oil Refining Company entered into a contract with plaintiff, Henry G. Meigs, Inc. (hereinafter referred to as "Meigs"), to supply Meigs

with asphalt of certain grades. Under the contract Meigs was to be sole distributor for the State of Wisconsin except for certain designated parts of the State.

Meigs claims that the Wisconsin Oil Refining Company defaulted on the contract. Meigs made a claim for $39,098.-05 damages and submitted a statement setting forth the computation of that amount.

Defendant, Empire Petroleum Company (hereinafter referred to as "Empire"), merged with Wisconsin Oil Refining Company, the merger becoming final in January, 1956. Meigs asserted its claim against Empire for this sum. Thereafter negotiations were had between Meigs and Empire regarding this claim. These negotiations ended in the April 27, 1956, contract. Under this contract Empire was to sell to Meigs asphalt of certain specifications. There was an area covering a fifty mile radius from Sheboygan in which Empire agreed not to sell to anyone else. The contract contemplated that new contracts would be negotiated for the next four successive years. It contained this provision:

"VI. First party agrees to pay second party the sum of Twenty-Five Thousand Dollars ($25,000.00) in full settlement of the claim of second party under the contract dated February 17, 1955, payable as follows: First party shall pay to the second party Fifty Cents ($.50) per ton for all paving asphalt delivered and sold by first party to second party, such payments to be made on the last day of each month during the term of this contract. If the sum of such payments so made do not amount to Five Thousand Dollars ($5,000.00) during the term of this contract, then in that event first party will pay to second party enough money to make up the difference between Five Thousand Dollars ($5,000.00) and the total of the payments so made. When all of said payments shall equal the sum of Twenty-Five Thousand Dollars

($25,000.00) said obligation shall be fully paid and satisfied. In the event the parties hereto are unable to negotiate a new contract for the year 1957 and subsequent years and before said Twenty-Five Thousand Dollars ($25,000.00) shall be fully paid, then the full amount of its claim of Thirty-Nine Thousand Ninety Eight and 5/100 Dollars ($39,098.05) shall be due and payable to second party and the first party agrees to pay the second party immediately the sum of Thirty-Nine Thousand Ninety-Eight and 5/100 Dollars ($39,098.05) less any payment made to second party by reason of the payments provided by this paragraph. The parties further agree that in the event first party fails to carry out the terms of this contract, that the sum of Thirty-Nine Thousand Ninety-Eight and 5/100 Dollars ($39,098.05) less the amounts paid as provided by this paragraph shall become due and payable to second party, in addition to the damages, if any, sustained by the party of the second part by reason of the failure of the party of the first part to carry out the terms of this contract."

The 1956 contract, insofar as the delivery of the asphalt and the payment of the $5,000.00 is concerned, was ultimately performed to the apparent satisfaction of the parties.

Beginning in August, 1956, Meigs pressed Empire to negotiate a contract covering the 1957 season. Empire wished to delay negotiations while it figured out some plan of disposing of by-products resulting from the production of asphalt required by Meigs, and wanted to consider complications resulting from the grant of exclusive territory to Meigs under the 1956 contract.

Correspondence ensued with Meigs pressing for negotiations. The ultimate result was that negotiations were had in Milwaukee. Following these negotiations and on January 31, 1957, the then attorney for Meigs wrote a letter to

Empire enclosing a proposed contract. Among other provisions in this proposed contract was one as follows:

"In the event that * * * (Empire) lowers the figure of $2.40 for heating costs to any other competitor of * * * (Meigs) or client or customer of * * * (Empire), then in that event, it is agreed by and between the parties that the figure of $2.40 for heating costs is to be lowered by * * * (Empire) to * * * (Meigs) to meet competition and the figure given by * * * (Empire) to any competing company or person or to any client and customer of * * * (Empire)."

It also contained this provision:

"It is further agreed by and between the parties that * * * (Empire) shall not sell paving asphalt cement with the penetration ranges as herein specified to any broker or highway contractor or to any customer of * * * (Empire) directly or indirectly at prices less than herein stated and * * * (Empire) agrees that its price to any broker or highway contractor or customer of * * * (Empire) shall be the prices herein stated plus the latest tariff established by the Schwerman Trucking Company."

On February 8, 1957, Empire replied pointing out the respects in which it claimed the proposed written contract did not reflect the agreement between the parties, among other things regarding fixing an obligation to buy and sell grades of asphalt and some other "corrections."

On February 12, 1957, Meigs' attorney submitted a redraft of page 2 of the proposed contract, fixing the obligation at one thousand tons and explaining the grades.

On February 26, 1957, Empire by letter rejected the Meigs redraft and enclosed a proposed draft prepared by or for Empire. This draft rewords paragraph 1 of the contract, the obligation to buy and sell provision, in more definite terms. As to paragraph 4, Stone, defendant's President, on behalf of Empire, stated that he believed the redraft more clearly "sets forth our position regarding the settlement of the old claim," and he concludes the letter of transmittal as follows: " * * * if such is acceptable to you, please have it executed * * * ."

This proposed contract contained the provision that if Empire " * * * grants a lower price on asphalt cement, f.o.b. its Sheboygan, Wisconsin refinery, to any highway contractor, or to any person, firm or corporation who resells such material to any highway contractor, * * * (Empire) shall also grant such lower price to * * * (Meigs) and in case * * * (Empire) offers a lower price on asphalt cement delivered to the point of use by any highway contractor, * * * (Empire) shall also offer such lower price to * * * (Meigs), and in such event * * * (Meigs) shall be entitled to the regular sales discount of One and 50/100 Dollars ($1.50) per ton as above provided."

On March 14, 1957, Meigs wrote Empire that the Empire draft did not conform to the conference in that it added a provision as to truck indicators to be supplied by Meigs. Meigs rejected the Empire proposal. It pointed out that it could not imagine in what instance some of the provisions would enure to Meigs' benefit, and that the omission of the second to the last paragraph of Meigs' proposal, quoted above with reference to price fixing, would result in Meigs no longer being competitive with Empire. Meigs stated:

"It is apparent from your re-draft that we cannot negotiate a new agreement and we, therefore, make this demand upon you, that you pay us the sum of $34,098.05, * * * ."

Empire wrote on April 1st explaining the provisions of its proposed contract. With reference to truck indicators, it pointed out many delays in loading in the previous season because some trucks were not equipped with indicators to tell how heavily they were loaded. It pointed

out that since Empire had to pay demurrage, it felt justified in requiring that the trucks be properly equipped so they could be loaded quickly and accurately. Among other things, Empire pointed out that under its proposal, it agreed to give Meigs the same price it quoted to others if that was lower than that determined by the formula provided in the contract. It objected to Meigs' proposed contract as attempting to bind Empire to maintain a price to all customers (not just highway contractors) and to maintain that price regardless of market conditions.

It added that there were several reasons why this price-fixing provision was not acceptable, among them being " * * * the fact that it appears to be an attempt to fix prices, which might be in violation of the Robinson-Patman Act [15 U.S.C.A. § 13 et seq.] and, therefore, might be a violation of Federal laws and subject us to a possibility of treble damages. We cannot, under any condition, enter into any such price fixing arrangement. To avoid this and to make a lawful contract, we proposed that we would give you exactly the same price as we gave any highway contractor or any person, firm or corporation who resells our merchandise to any highway contractor and at the same time allow you your regular sales discount or commission."

In the letter it is further claimed that Empire at no time "accepted or agreed to accept" the claim in the amount of $39,098.05. It recites that Empire did agree on a compromise settlement of "this matter in the total amount of $25,-000.00 * * * with a minimum of $5,-000.00 per year. We have paid the first $5,000.00 under this agreement and will continue to allow you 50¢ per ton on each ton of asphalt purchased by you from us during 1957 and subsequent years, with a minimum of $5,000.00 per year, until the $25,000.00 is fully paid. We consider this to be effective whether or not we enter into a new contract, and expect to keep our part of this agreement."

The letter concludes that Empire does not believe it within the prerogative of Meigs to arbitrarily reject Empire's redraft and at the same time demand a larger amount than $5,000.00 per year. "Furthermore, we do not concede that a condition exists whereby we are unable to negotiate a new contract for the year of 1957 and subsequent years."

On April 10th, Meigs answered rejecting Empire's explanation and ending with an ultimatum that Empire accept Meigs' proposal of January 31st within five days or all negotiations would cease and that the letter would constitute a demand.

Section 133.01(1), Wisconsin Statutes of 1955, in effect at the time, provides:

"Every contract * * * intended to restrain or prevent competition in the supply or price of any article or commodity in general use in this state, to be produced or sold therein or constituting a subject of trade or commerce therein, or which * * * contract shall in any manner control the price of any such article or commodity, fix the price thereof, limit or fix the amount or quantity thereof to be manufactured, mined, produced or sold in this state, or fix any standard or figure in which its price to the public shall be in any manner controlled or established, is hereby declared an illegal restraint of trade."

Thereafter the Chapter provides certain penalties.

In Section 133.25, the so-called "Fair Trade Act," it is provided that no contract relating to the sale of a commodity which bears, or the label or container of which bears, the trade-mark, brand, or name of the producer which is in fair and open competition with commodities of the same class produced by others shall be deemed to be a contract or combination in the nature of a trust or conspiracy in restraint of trade by reason of a provision that the buyer shall not resell such commodity except at the price stipulated by the vendor.

There is nothing in the evidence of this case which could by any stretch of

the imagination bring the asphalt within the "Fair Trade Act" exception.

While both the Federal Courts and the State Court of Wisconsin have in general construed the statutes relating to restraint of trade to prohibit only contracts which "unreasonably" restrain trade or which are a part of a course of action designed to restrain trade, there have been no citations which would permit any leeway in violating the price-fixing provision in the statute above quoted. Meigs has taken the position that one cannot tell whether this contract would violate these statutes until there was a chance to observe its application in actual practice. It argues that the asphalt covered by the contract is but part of Empire's output. However, it fairly appears from the evidence that this type of asphalt is widely purchased by the State, by municipal corporations, by highway contractors, and also by customers in other States.

Martin Torphy, Meigs' counsel at the time of the negotiations, when on the witness stand testified in his opinion that this proposed "price-fixing" provision was not illegal, pointing out that certain appliances were sold under price-fixing contracts and that such contracts not only were legal but were enforced by the courts. When the Fair Trade Statute was pointed out to him, he evidenced surprise, and the court concluded that he was not aware of the difference between fair-traded articles and this asphalt so far as price fixing was concerned. There is, however, some testimony by Henry G. Meigs, President of the plaintiff corporation, taken on his deposition which was read in evidence at the trial, which indicates that plaintiff's attorney advised very strongly against "that clause I just read a moment ago." It is not clear from the portion of the deposition received in evidence as to just what clause was referred to. It may have been the "price-fixing" clause.

The provision with reference to the $39,098.05 in the 1956 contract was extremely harsh. It put Empire at the mercy of Meigs. Unless good faith is a part of and enters into every contract, and, therefore, this contract, Meigs is in position to arbitrarily force a forfeiture on Empire.

"The obligation to use good faith in carrying out what is written underlies all written agreements." 12 Am.Juris., Contracts, § 239.

It is also stated in the same section:

"In fact, it may be said that contracts impose on parties, not merely obligations expressed in them, but everything which, by law, equity, and custom, is considered incidental to the particular contract or necessary to carry it into effect."

In Rustles v. Christensen, 1932, 207 Wis. 326, 330, 241 N.W. 635, 637, the court states:

"In 2 Williston, Contracts, p. 1305, it is stated: 'It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure.'

"To this effect see Halsey v. Waukesha Springs S. Co., 125 Wis. 311, 104 N.W. 94, * * *; Case v. Beyer, 142 Wis. 496, 125 N.W. 947; Bannen v. Kindling, 142 Wis. 613, 126 N.W. 5; Graf v. Laev, 120 Wis. 177, 97 N.W. 898; Spafford v. McNally, 130 Wis. 537, 110 N.W. 387. In Fischer v. Schumacher [207 Wis. 10] 238 N.W. 801, the court said: 'It makes considerable difference with reference to plaintiff's right to recover whether the refusal to permit his continuance of the work was due to a breach of the contract on the part of the plaintiff * * *.' "

On the obligations to live up to the spirit as well as to the letter of a contract, the court stated in Loehr v. Dickson, 1910, 141 Wis. 332, 336, 124 N.W. 293, 295, 30 L.R.A.,N.S., 495:

"That contract required defendant to convey to the plaintiff certain land upon payment of certain money

within a defined time. It imposed upon the plaintiff a duty to the defendant to make such payment or at least tender to him personally, for the conveyance was to be cotemporaneous, and such cotemporaneousness was doubtless necessary to the raising of the money to be paid. From a contract imposing such duty on the plaintiff there resulted by necessary implication the agreement on defendant's part to do no act which would render such payment or tender impossible. This upon the general principle that he who by mutual contract confers on another a right or imposes a duty impliedly agrees not to defeat that right or make impossible the performance of that duty by any affirmative acts of his own."

It is stated by the Court of Appeals of New York in Brassil v. Maryland Casualty Co., 1914, 210 N.Y. 235, 104 N.E. 622, at page 624, L.R.A.1915A, 629, as follows:

"But there is a contractual obligation of universal force which underlies all written agreements. It is the obligation of good faith in carrying out what is written. The defendant's failure to observe this requirement of the contract in suit is the thing upon which its liability may safely be predicated.

* * *

"Without attempting to further characterize the defendant's position, it is enough to say that it would be a reproach to the law if there were no remedy for so obvious a wrong as was inflicted upon this plaintiff. His rights, as we have said, go deeper than the mere surface of the contract written for him by the defendant. Its stipulations imposed obligations based upon those principles of fair dealing which enter into every contract."

The delay in the final negotiations need not have carried the contract date later than the date the 1956 contract was entered into, had plaintiff negotiated in good faith and not insisted on an illegal provision. There is nothing in the record to indicate that there was anything other than the insistence on the illegal provision that prevented the negotiation of a contract. Empire at no time stood on any unusual or unreasonable demand.

The compliance with the request for indicators on the trucks would not have been costly, and there is no evidence that Empire insisted on such provision being in the contract other than suggesting and requesting it. Empire made suggestions about rewording the paragraph regarding the penalty. The record does not indicate and the court finds that Empire at no time insisted on its own rewording in that respect. The failure of further negotiations and the failure to agree on a contract were basically, if not entirely, brought about by Meigs' insistence on the illegal price-fixing provision.

The breakoff in negotiations came as the result of plaintiff's fiat that the illegal provision would be accepted or there would be no contract. The court finds that plaintiff, by this insistence on a condition impossible for Empire because illegal, did not negotiate in good faith. It should not, as the result of such conduct, be able to invoke this forfeiture.

It is the finding of the court that Meigs did not negotiate in good faith; that in that respect it breached its contract. It made it impossible for defendant to negotiate a contract for the year 1957.

Plaintiff's breach prevented defendant's performance of the contract. Judgment should be entered on behalf of the defendant.

Defendant's counsel is directed to prepare proposed findings of fact, conclusions of law, and order for judgment in conformity with this decision, submitting them to plaintiff's counsel for approval as to form only.